Good morning. The first argument this morning is in 17-1114 in Re Eureka Restaurant Group. Mr. Leach. Good morning, and may it please the Court. Brian Leach on behalf of Eureka Restaurant Group, or ERG. The trademarks in this case look different, sound different, convey different commercial impressions to consumers, and share a common term that has been diluted by widespread third-party use in a crowded marketplace in which consumers are readily able to differentiate among various trademarks, even based upon minor distinctions. The trademark trial and appeal board in this case legally erred in holding that there was a likelihood of confusion between the marks in this case, Eureka Pizza, and Eureka Discover American Craft. I'd like to start, if I might, by discussing the first DuPont factor, the dissimilarity of the marks. And in particular, the board's improper... Why don't you move, can you move to factor two, because that seems to be one that the board relied more heavily on. In other words, the marks are identical. The services are identical, right? The board did hold that the services were identical, that's correct. We dispute that holding for a number of reasons. As the Supreme Court in the B&B hardware decision, footnote four of that decision pointed out, it's an open question whether and how often the TTAP looks beyond the face of the application and the registration in evaluating the relatedness of the goods and services at issue. But even if the Court were to disagree with us on that point, and find that the services were similar or identical, we would still prevail on factor one and factor six, which are the dissimilarity of the trademarks, as well as the dilution through third-party usage evidence. Isn't this case a little bit different than, like, DuPont, for example, or Four Seasons, where there was some sort of agreement, at least, between the parties, that one would use the mark for this purpose, and the other would use the mark for that purpose. And when I say between the parties, I mean between the holder of the registered mark and the trademark applicant. Is there anything like that in this case? We don't have a consent agreement in this case, but I think we have the next best thing, which is the registrant's own statement in its prosecution history at 283 to 284 of the appendix. The registrant points out that its services are targeted towards the fast-food-consuming public. But its general description of its trademark is well beyond that, right? I mean, it just says for restaurant services. Our description says for restaurant services, and we tried to amend the identification of services in our application, and the board rejected that. And we even said that we would be willing to work with the board or the examiner to further amend. But I take Your Honor's point. There was a consent agreement in Four Seasons. It's notable that the consent agreement in that case did not have a geographical limitation on advertising for the mark. So to the extent there was a concern about consumer confusion, the applicant in that case, Four Seasons-Biltmore, I believe, would have still been able to advertise its mark nationally. And, you know, I think the reason why these consent agreements have probative weight in the analysis is because they reflect the considered views of the parties who this Court has said are on the firing line of the marketplace. In this case, we have essentially the same type of evidence. We have the registrant's own statements distinguishing its mark from Eureka for Cheese. Now, to be sure, we don't have a state law breach of contract remedy between the parties. You don't have a statement from the registrant of the mark with regard to your mark, whether they think there's confusion at all, which is something that I think those other cases reflect as something that's important when the TTAB is making its determination. Absolutely, Your Honor. We don't have that statement. But, again, I think the registrant's statements from its prosecution history are the next best thing. And they reflect the fact that it didn't view its mark, Eureka Pizza, as being confusingly similar to the one-word mark, Eureka for Cheese. And so I think, you know, even that analysis would apply to this case with even greater force where we have even more differences between the marks at issue. You know, a one-word mark for Eureka for Cheese is less different than the marks in this case, where you have, you know, the orange exclamation point. You have the imperative phrase that follows the term Eureka for ERG's mark. And so, you know, the fact that we don't have, you know, a breach of contract remedy, you know, in the way that the consent agreements would have provided in those other cases, isn't necessarily going to detract from the probative value of the registrant's statements in this case related to similar marks. What do we do with respect to the parts of the marks that are disclaimed with respect to the registration? Are those compared at all? I mean, when you're doing that comparison that you're talking about, I think you're referring to things that are disclaimed, and I just don't know how to treat that. Yes, they are given appropriate weight. Now, they are not ignored, and that's part of the flaw in the board's analysis in this case, is the board looked at the disclaimed parts of the marks and said that because those are descriptive and disclaimed, they can't have source distinguishing function. And that's wrong as a matter of law. So as this court pointed out in Juice Generation and a number of other cases, simply because a part of the mark is descriptive or disclaimed, and particularly with the disclaimer issue, the public doesn't know that that part of the mark has been disclaimed. The public engages with the mark exactly the same way it would as if that term had been protectable under trademark law. And so the analysis still takes into consideration whether or not even the disclaimed portions of the mark. And to fail to do so, as we think the board did in this case, is an error of law. It runs afoul of the anti-dissection rule. And if I could walk the court through, I think, what the flaw in the board's analysis was in this case with this section, I think it would be helpful. So in A9, the board makes clear that it's really engaging in a dissection of the marks. It says, you know, the marks are not identical, but that they're similar in the sense that they begin with an identical term, Eureka. The remainder of the board's analysis on that point really is devoted to explaining why Eureka is the dominant feature of the mark and why the other features of the mark are peripheral and secondary. And this is a really key point at A9 through 11, where the board says, Eureka Pizza. The term pizza is descriptive and disclaimed. And therefore, it can't have a source distinguishing function. And it makes a similar conclusion as to the term American craft in ERG's mark. But that gets the analysis exactly backwards in this case. As this court held in Shen, this is very much a case like Shen, where, you know, in this case, pizza is descriptive, but it's precisely because it's descriptive that it has source distinguishing function, because it describes a product that is not in any way associated with ERG's mark. And conversely, ERG's mark, the American craft phrase— But that goes back to the nature of the services issue, doesn't it? Because Eureka Pizza's mark is not registered as a pizza mark. It's measured—it's registered as restaurant services. And yours is attempting to be registered as restaurant services, too. So the fact that there are two different kinds of restaurant services, I don't understand how that helps you. I mean, let's assume Eureka—I mean, we have to assume Eureka Pizza is valid because it's registered. If somebody tried to come in and register Eureka Taco as a mark and said restaurant services, wouldn't there be a likelihood of confusion there? Well, I think the court has to engage in an analysis like it engaged in Coors, where it looked at evidence outside the application to determine whether or not the goods and services would have been related as the mark was used in commerce. And so in this case, you know, I take your honors— Let's assume we don't know anything other than what's in the registrations, which is Eureka Pizza is registered as restaurant services, and Eureka Taco is attempting to be registered as restaurant services. Yes, sir. I mean, everything else is the same. They're very similar looking. You know, you can throw in an exclamation mark if you want to and the Eureka Taco mark. I don't think that makes much difference. Isn't that the problem here is that you're both attempting to register a mark in restaurant services, and the key identifier is Eureka. The rest of this stuff is descriptive. Well— It causes confusion about whether Eureka restaurant group is owned or operated or is the same as Eureka Pizza or vice versa. I think it's true that if there is similarity in the services or identity between the services, there's a lower standard of similarity that would apply. And I take your honors' point. I do want to note that—and I don't want to change the facts of your honors' hypothetical, but I do want to note that Eureka Pizza's mark is limited by the additional phrase featuring delivery, carryout, and catering services. But even again, taking your honors' point, they're identical— Well, featuring but not limited to. Well, is— You know, I have—I'm a little curious as to why you're not concentrating on the description of the other mark, which is, I think, the generic text one where the description is not restaurant services. It's what, supplier of food preparation or something like that, which seems to me that may be of some significant difference to restaurant services. Well, the reason—we're taking the board's analysis as it comes to us, and the board in this case really focused on the 242 mark, the literal description, and we don't take issue with the board's method of analysis on that point. I agree this would be a much different case and I think a much easier case. If the court were just to analyze our stylized mark against the 867 stylized mark. But again, to go back to your honors' point, you know, I think that there is— even conceding that they're identical surfaces, this court has looked— when it's trying to evaluate whether or not the board has improperly dissected the marks, it looks to see whether or not the board is engaged in a proper contextual analysis of how the marks are actually used in commerce. And it did that in Chen. It did that even in a case like Hewlett-Packard, where the Packard technologies was helped to be confusingly similar to Hewlett-Packard. And the court said, well, technologies is a different word, but there's still likely a confusion because Hewlett-Packard, we know that that's heavily involved in the technologies industry. But here we know that ERG is not involved in the pizza delivery or catering industry. And so, you know, in terms of the way the marks are actually used in commerce, the descriptive features in this case can still have source distinguishing function. In looking at—additionally, you know, I think there was a flaw in the board's analysis as to commercial meaning, where the board, you know, essentially held that Eureka Discover American Craft would have source distinguishing— I'm sorry, Eureka Discover American Craft would have geographic connotation, where there's really no evidence at all to support that. And conversely, that there would be, you know, the traditional classical meaning of the word Eureka, that that meaning would attach to Eureka pizza. Now, even the registrant's own statements in 283 and 284 really belie that contention, where the registrant explains that consumers, when they engage with a Eureka pizza mark, they're not going to decouple the two words. They're going to read them together, and the phonetic sort of symmetry between the words is going to enforce that connection. And they're going to essentially say that this is, well— that this is, you know, not something that's conveying a sense of discovery about pizza, but that it conveys something else. And in this case, our position is that that would be the geographic connotation of Eureka pizza as it relates to Eureka Springs, Arkansas. Okay. You're into your rebuttal. You want to sit down for a bit and let us hear from you. Thank you, Your Honor. Appreciate that.  Good morning. May it please the Court. The Board engaged in exactly the correct analysis here. The Board properly identified that the services were identical. It noted that because the services are identical, the degree of similarity between the marks need not be as close as it would be if the services were less closely related. And the Board carefully analyzed the marks in their entireties. Did they try to amend their application here so that it would avoid anything dealing with pizza or fast food or so forth? Was there an effort to do that? Your Honor, there was a purported effort to amend, but the amendment was not a limiting amendment. It was to state including dine-in services. So an amendment that might have had some relevance here would have been an amendment that excluded the specific services that are offered by the registrar. And that would, I mean, I know you can't speak here to resolving this case, but that would possibly have made a difference, correct? It certainly would have been a different question. The Board reserved that question because it wasn't presented with that question, but it would have been an express limitation in the application that would have informed the Board's analysis. And the Board would not have concluded that the services in that instance were legally identical as it did here. But here we have a non-limited ID in the application, and so the Board correctly determined that the services were legally identical. I wanted to just address one point with respect to dissection, and this is the Shen Manufacturing decision, because in that case this Court was concerned about dissection. But what this Court said was that Shen argues that there was error in overemphasizing the words of putting on the, in the phrase putting on the Ritz. And it said that Shen contends that putting on the has no significance aside from its use in conjunction with Ritz. As such, Ritz is the only relevant portion of the mark, and therefore RHL's mark is identical to Shen's mark. So the argument there was that the Board should have ignored language in the mark and treated the marks as identical. The Board did not do that here. The Board spent five pages of its decision examining the marks in their entirety and looking at the additional wording in both of the marks, examining their connotations, and saying that while the marks do have some dissimilarities, as a whole, consumers are going to understand that there is some connection between the two marks. I wanted to ask you about the third-party uses of Eureka. One of the arguments that is made here is that the Board didn't properly assess the third-party use. What is your response to that? I guess there were seven registrations, and the argument is that the TTAB distinguished those seven registrations just because they weren't directed to restaurant services. Do you agree with that characterization of the decision? Well, I do agree that none of the registrations are directed to restaurant services, and I agree that that's the correct analysis. The analysis... So if it's not directed to restaurant services, it shouldn't be considered at all, or that that's part of the analysis, you look at what it's directed to? Yeah, that's part of the analysis, right? So the question about third-party, and this is discussed in Juice Generation, the question that the third-party registrations attempt to answer is whether the term is diluted in the relevant field, right? And so you have to assess whether those registrations go to the relevant field, and here what the Board said was that none of the registrations go to restaurant services, right? So if anything, actually what the registration evidence does here is demonstrate that on the register, Eureka is unique to the register. It is a strong term as reflected by the lack of third-party registrations for restaurant services. The types of goods that were covered by the registrations were food items and... You're talking about the seven other registrations? The seven registrations, right? So the registration evidence here... It's seeds. It's seeds and agricultural products, right? One of them was agricultural products. So the Board didn't discount it. It just said that it didn't demonstrate weakness for the term Eureka on the register. And the Board also considered the minimal common law evidence and just found that as a whole, the third-party marks evidence didn't demonstrate weakness of the term Eureka for restaurant services, and so it found the factor neutral. It didn't weigh it against the applicant. It just didn't find that it weighed in favor of registration. If the Court has no further questions, sit down. Thank you. Thank you, Your Honor. Just a couple points in rebuttal. The first point I want to address is the dissection analysis of the Board. I would encourage the Court to look at the Board's decision in juice generation, which my friends on the other side cited in their brief. The analysis is remarkably similar in terms of the length and the depth of the analysis. In both cases, the Board said we're considering the mark in its entirety, we're looking at the different terms, but we're essentially saying that because they're descriptive or disclaimed, we're not going to afford them the same level of weight. This Court held that that analysis was insufficient to show that the Board had not engaged in improper dissection. I think the same analysis would apply in this case. I think the analysis is really, really remarkably similar. The second point that I want to make is that the third-party registration evidence and the third-party usage evidence in general, the Board's limitation of this idea that the marks, the third-party usage, has to all be in, as they say today, the same relevant field or the same restaurant industry, is I think rejected both by juice generation, which it's not clear from that case that all of those marks were related to juice bar services or restaurant services. Some of them appeared to have been for food. But also in the Jack Wolfskin decision, where this Court held that the paw print design that had been used on these various apparel items, it didn't matter that some of the third-party uses were used for pet-related goods or for school sports teams, even though the marks at issue were used for apparel clothing and for apparel companies and for sporting goods companies. So I think that part of the reason why there's not that granular level of specificity required for third-party use evidence is because that's not how consumers engage with trademarks. They look at them holistically, as this Court has pointed out, and they engage with what essentially would be the meaning of them and not whether or not this is the same exact field and whether or not that would make a difference in terms of being a source-distinguishing or source-indicating function. If the Court has no further questions. Thank you. Thank you very much. Thank both sides. The case is submitted.